The next case today, number 231970, Kimberly A. Ripoli v. State of Rhode Island Department of Human Services. Will counsel for appellant please come up and introduce yourself on the record to begin. Good morning, I'm Chip Moller for Kimberly Ripoli, may it please the court. May I reserve three minutes for rebuttal? You may. Thank you. It is clear under this circuit's case law that an employer may reorganize for non-discriminatory purposes and may even affect someone in a protected category for non-discriminatory purposes. It is also clear that courts have made clear that reorganization in particular is a way that an employer, employers have used in the past to mask a discriminatory motive and in this case... No, no. That isn't really the issue here. There was a reorganization. It may have been entirely justified, but out of the reorganization, the only woman in the department who had very good performance reviews out of the shuffle is the one who ends up without a job. It could be that your case starts with there was no need to reorganize because, I've forgotten, Yarn, was that his name, was told that of his two reasons to reorganize, fiscal and efficiency. Fiscal was not really a good reason. He was told that, so that drops out. Nonetheless, he goes ahead and he reorganizes for efficiency reasons. So let's assume hypothetically that it's a new boss, new to the state government, first time they actually have a director of this veterans agency and he thinks it can be run more efficiently. Let's just assume hypothetically. So he has a basis to reorganize. I think the key question is, so how come out of the reorganization she is the one to lose the job and younger males and heterosexual males end up with all of the positions? So it would be helpful to me if you could focus on those issues. Thank you, Your Honor. I will. There is no evidence in the record that anybody ever had any problem with efficiency, the OVA running efficiently because of Tripoli's presence in the organization. In fact, the only evidence is that her presence in the OVA was a positive. She had just landed a $60 million grant, for instance, from the VA. So I asked Mr. Yarn at his deposition, I asked him what is the basis for your belief that the position, well actually, Your Honor, I'd like to back up a little bit because you say efficiency and really Mr. Yarn doesn't quite go that far. I think he's a step prior to that by saying it was a redundant position. He doesn't actually say that it was inefficient. He says it was redundant. And I asked him what was the basis of your belief, your determination that the position was redundant and he pointed to the job descriptions. He said the job descriptions are the same and if you look at the job descriptions, they're obviously not the same. And so that is the thin, narrow basis, non-discriminatory justification for Mr. Yarn's decision to terminate Ms. Ripley. And I think that under the McDonnell-Douglas burden-shifting scheme... Can I go, not to interrupt you, but he says he performs, is it pronounced lean analysis, LEA and whatever that stands for. And your client actually knows what that is because she performed those in the military. But there does appear to be a disputed issue of fact as to whether he actually performed a lean analysis to support the conclusion that her position was redundant. So we have that. We have the, he says the job descriptions show her position was redundant. You say no, a jury could find from the job descriptions that the director and the, is it assistant or associate director, what title did she have? Associate director. Associate director are not redundant. She may have been outperforming her job because there was no director for a number of years, but that doesn't mean the position was redundant. So what else do you have? Well, well the lean analysis I think is quite important, Your Honor, because the lean analysis is a very specific type of analysis that is done in corporations around the world. And it is a very structured kind of analysis. And Mr. Yarn did not perform that kind of analysis. And the, even the governor of the state prized the lean approach and asked all executives to conduct lean analyses. And so it, Mr. Yarn admitted that he knew how to do a lean analysis. He was not certified in it, but he admitted that he knew how to do it. He admitted that he did it. And so, and when you do a lean analysis, you do not simply look at two job descriptions and come to a conclusion. Secondly, Your Honor, I think perhaps the, our strongest evidence of a pretext is the fact that Mr. Yarn did not disclose the desire to create a new position for Michael Jolin and promote him into it days after Ms. Ripley's last day. And if Mr. Yarn had done the lean analysis that he claimed that he performed, clearly he would have reported in his June 2016 email alleging a lean analysis conclusion that indeed we need Mr. Jolin to be promoted. We need to create a new position for Mr. Jolin. We need to promote him into it. And, and that I think is one of the facts that distinguishes. And you're saying had an announcement been made that there would be a reorganization and it would include this new position, then your client could have applied for the new position and been considered for it. That's, that is true, Your Honor. And in addition, Mr. Yarn would have had to justify Mr., the selection of Mr. Jolin over Ms. Ripley. Right. And, and thereby he subverted the HR review process that he knew that he had to undertake. And, and so I, I think that the omission and, and, and it was one of the, I think, largest errors in the decision below was not appreciating that the decision to hide the plans to create a new position for Mr. Jolin and promote him into it and give him a raise and hire only males to the, to the executive team. Your, your complaint says your client was the only female and the only non-heterosexual in this department. And at some point the defense was, no, she was not the only female. There was Lynn Lavallee who was also a direct report to Yarn. But when we looked at the organizational charts in my chambers, Lynn Lavallee is not a direct report. So that, again, strikes me as a material issue of fact. Yes. That probably could go to a jury. I, I think you read that correctly, Your Honor. And in my reply, I noted that, that Lynn Lavallee, that the, the state incorrectly identified her as a member of the executive team. She is an esteemed member of the OVA, but she's not on the executive team. I believe you allege that Yarn referred to somebody as his chief of staff from the first day he was on the job, one of the men? Yes. Mr., yes. Mr., Mr. Yarn said when he arrived, he said he wanted a chief, chief of staff. Mr. Jolin, in fact, suggested that Mr. Yarn needed a chief of staff. And if you look at, for instance, in the record appendix at page 50 to 53, you will see Mr. Yarn admitting that in as early as January and February of 2016, he was meeting alone with members of the governor's staff and Mr. Jolin. And, and, and, and, and he, that was prior to him even being hired by the state. And those, what's the evidence that normally your client would have been the person to go to such meetings or that she was effectively the chief of staff? Well, Your Honor, what I'm saying is that at that moment, Mr. Yarn and Mr. Jolin started working together. Yeah. While Ms. Ripley was the head of the OVA, Mr. Yarn had not even been announced as the head of the OVA when Mr. Yarn and Mr. Jolin started working together. And you see in the pattern I've put in our briefing that Mr. Yarn asked Mr. Jolin to do things that were clearly not in his limited role as a chief at the time. And Mr. Jolin admitted that Mr. Yarn was asking him to do things that were not in his role. Counsel, can I just turn you to, it seems to me that you have two different arguments. One is there's good reasons why an associate director position should have been maintained. But as we know, people come in, they reorganize often. People who are newly in charge decide they want different kinds of roles. So then you have this other argument that even if he created this new role, your client should have been considered for it. But there was a subversion of the normal process to make sure that she wasn't considered. So I guess what I want to ask you is, you know, what the district court said below was that crediting some of your arguments that the reason for some of these switches didn't quite make sense, there was still nothing in the record that showed that it was a discriminatory reason that resulted in Mr. Jolin getting this position rather than your So can you tell us, what is the best record evidence to show that it was in fact a discriminatory reason? Is it just that there were no women left on the executive team at the time that your client was let go? Is it something else? Well, I think it's important to recognize that there is evidence of a gender bias. And that is, number one, that after Mr. Yarn fired Ms. Ripley, he filled three open positions that he created that were all filled with men. Additionally, there was certainly evidence that, well, let me back up, Your Honor. It is clear by the decisions of this court that pretext alone may, in some cases, be sufficient to prove discriminatory motive. It may in some cases, but what the district court decided below is that there's also clear case law saying it doesn't compel a finding in your clients. It doesn't compel a finding of liability. And you look at the totality, and what the district court said was looking at the totality, he didn't see anything showing discrimination as the real reason. So that's why I asked you the question. So do you think the best evidence is that it was only men who were then hired? That, in other words, that the new director subverted the process because no matter what, he didn't want to hire a client into any new role because she was a woman? Well, I think, Your Honor, we outlined all the bases for reasons how you, ways you can find that the reason, the just decision that Mr. Ripley was pretextual, and I think that all of those go to the... Can I? I think the focus has to be, this is on summary judgment. The question is not whether your evidence compels a finding. It is whether you have just enough to get to a jury because there are enough disputes of fact arising out of this to at least call into question the explanations that have been given and the timing of the events, and you get to a jury because of that. It's not up to the district court to make these rulings. It is up to a jury. So, again, now putting that in context, could you reply to Judge Riegelman's question about, okay, what is there to present to the jury that suggests that this guy was not going to let her continue in her job because she wasn't a white heterosexual male? Well, sure. We have already talked about how he made the job for Mr. Joland secretly. The fact is that after Mr. Yarn said that Ms. Ripley's position needed to be eliminated, they actually did not eliminate the position. The position still exists today, and it could be filled the day after this court's decision. Mr. Yarn falsely stated that the reorganization was compelled by the lien analysis when the lien analysis was a sham lien analysis, and by claiming that the change needed to happen soon, Mr. Yarn was creating a false urgency to the situation without any evidence that Ms. Ripley's presence in the OVA caused inefficiency or redundancy of any kind. Mr. Yarn nevertheless felt the need to move quickly, and I think that that is evidence from which a jury could infer that the stated reason was pretextual. So you, as I understand it, counsel, don't have a smoking gun here, but you're saying that if you add up four, five, six different decisions that Mr. Yarn made, all of which seem to favor either Joland or Ms. Ripley, white male applicants generally, and to disfavor your client, that that accumulation of facts creates a genuine issue of material fact for the jury on the question of discrimination. Well, yes, Your Honor. The First Circuit has found pretext on a much thinner record. Just a couple years ago, in the case of Forsyth versus Wayfair, the simple question was whether the plaintiff resigned, and based on that fact alone, the First Circuit, based on the finding of a fact question on that narrow issue, the First Circuit, Your Honors, reversed the district court decision. In the Kinser case, similarly, the only question was whether the employee had a disciplinary problem that warranted the final point that was the straw that broke the camel's back. And on that narrow basis, this court— Case law, including a very recent case, I think it came out two weeks ago, saying if there are false statements made as to the reason for a particular job action, and they're material false statements, that also gets you to a jury. The fact that somebody is lying about their reasons creates the sort of issue where we want juries to use their common sense in making the determination. And I think, Your Honor, that a jury in this case could determine that Mr. Yarn was not telling the truth when he disclosed to executives in the state that the position of the associate director was redundant. The fact is that the state needs more people helping veterans, not fewer people helping veterans. And as I said, Mr. Yarn had absolutely no evidence, and the state has no evidence, that Ms. Ripley's presence in the OVA was anything but a positive for the state's veterans. Thank you, counsel. Counsel, I'm confused about what your position is with regard to the lien analysis. Is your argument that Mr. Yarn was gaslighting when he claimed to have performed a lien analysis because he never actually performed one? Or is your argument that he misperformed, that he attempted to perform a lien analysis, but because he didn't perform it right, the results came out unfavorable to your client? Well, Your Honor, Mr. Yarn claimed that he performed a lien analysis. He's a decorated veteran and said he was trained in, the testimony is that he was trained in lien. So I think we need to take him at his word that he performed a lien analysis, and I think that we can show the very thin nature of that lien analysis to show that he was not telling the truth, that he was using the lien analysis as a window dressing for a discriminatory motive. I'm sorry, did the governor order all of the agency heads to perform a lien analysis? Yes, Your Honor. For Governor Raimondo, the lien initiative was a statewide initiative that all department heads were supposed to undertake, and that's why Ms. Ripley was studying it, Jonathan Rasko was studying it. It was a statewide value, yes. I'm sorry, did she have to do one in her job? Ms. Ripley?  She... You just said that's why she was studying it. Well, yes, I mean, she was always undertaking continuous improvement. She suggested the creation of positions. She suggested the elimination of positions. She did not permit a lien analysis, to my knowledge, because she was not required to do so at the time. So this goes to Judge Selya's question. So he says he's done a lien analysis. He hasn't done a lien analysis. So he's not telling the truth. That can be evidence of pretext, but it also can be evidence that the person he's gaslighting is the governor. But then you would say, I guess, well, they can present that defense to the jury and say that's why he was misrepresenting what he was doing. He wanted the governor to think he had done one when he hadn't done one. But that's up to them. You've shown pretext. I think so, Your Honor. In Mr. Yarn's June 2016 email, it was to the senior HR person or one of the most senior persons in HR in the state. It was to Melba DiPina, the head of DHS. OK, I'd like to go back to the second part of Judge Selya's question. I take it your position is had he performed a correct lien analysis, he could not have concluded her position was redundant. That's correct. OK. And, yes, that is correct, Your Honor. Thank you, counsel. Thank you, counsel. Will attorney for Applee please come up and introduce yourself on the record to begin? Good morning, Your Honors. May it please the court, Paul Mayosky, Applee, the state of Rhode Island. Your Honors, summary judgment should be affirmed because plaintiff brings a case of discrimination without any evidence of discrimination. In a record spanning over 1,000 pages, there's no indication or explanation. Counsel, you've just heard extensive discussions, so perhaps you could instead, making grandiose statements like your opening, focus, please, on the issues that we've identified. The statements made by Mr. Yarn which appear to be untruthful. The fact that she gets fired before he announces new positions that she might have applied for. The absence of evidence other than his say-so that elimination of her position was done for efficiency reasons and certainly not supported by a lien analysis. And all of that is enough, along with the other things just argued, to get to a jury. He doesn't have to have compelling evidence. He doesn't. The district court used language which is plainly incorrect as to what someone needs to show to get to a jury on the pretext issue before a jury, putting aside those legal errors. The real question is, does it make any difference? So, could you please focus? Yes, Your Honor. I would just like to say then, at the high level, that we are, Reeves held that you must have both pretext and evidence of discrimination. And that is our point. There is no evidence of discrimination. She may lose her case in the end. That isn't the question. The question is whether summary judgment was properly entered. And the answer is yes, Your Honor, for many reasons. First, I would like to say that the court did accurately observe that they still serve a gatekeeping function here. They must look at all the evidence. And they must still, a summary judgment could still be appropriately entered, even when it loses concepts, such as motive or intent or involvement, such as in this case. We're well aware of that. So, on that point, on that point, first of all, there is no evidence of discrimination. So, we can begin with. Other than the fact the only woman in the department and the only non-heterosexual white male loses her job out of a reorganization when her performance has been entirely satisfactory. So, Your Honor, on the first, I'm going to break that down into two points. If you told that to someone at a cocktail party, they'd say, gee, that's pretty questionable right there. Well, first, Your Honor, we, first, Your Honor, she was not the only woman on the executive committee. There is Lynn Lovelli, who is not represented as part of the leadership role in that hierarchical chart. However, it is in the testimony very clearly that she was part of those meetings. She was considered part of. Okay. She's on the organizational charts. She's several levels down. She's a lower-level employee. And the fact that she attends meetings, but on the organizational charts, she's nowhere near Ms. Ripolli's position. Well, no, Your Honor, but then neither is Mr. Rasko or Mr. Jolin, who are the two comparators in this case. Ms. Ripolli was in a slot of her own. She was associate director, so she was above everybody. In that case, she was the only woman in her exact spot. And then there's also no man in that spot either. That slot doesn't exist anymore. So that's why it's important to look beyond the organizational charts to also the reality of the organization.  So you think there was no jury issue as to whether she was the only woman in the requisite levels in the department? Correct, Your Honor. And on top of that, I must say that in other case law, this court has held, like, for example, in the Ray case, a mere statistic, such as being the only member of a class. This isn't a mere statistic. Move on. What's your next argument? So, Your Honor, our next argument is that she was also not let go. She was not let go because of performance issues. She was let go because her spot was considered redundant. That is a business judgment that cannot be merely questioned to create a tribal issue or pretext. Is this court held in violence? No, but there can be a question of pretext. If a jury concludes that she was let go on the ground of redundancy, but that at about the same time a new position was created given to Mr. So, on that issue, Your Honor, there are two sorts of questions that you raise. One is on whether or not her role was redundant. Another one is on the replacement issue. This court has held summary judgment appropriate in both of those situations, finding that even if a jury could plausibly perhaps find that her position was replaced or that her position was not redundant, it still did not meet that level to make it past summary judgment. First, because on the matter of redundancy, the line that has to be crossed is not just whether or not a jury could possibly perceive the role as not redundant. The line is whether or not the evidence in the record makes it so implausible that the employer itself could not find the role redundant. And we're nowhere near that line in this case. The assertion is her job was essentially recreated after she was fired and a male was put into the job. That's what the evidence she is producing tends to show. Why isn't that, in combination with the lien analysis and some other disputes about whether Mr. Yarn was telling the truth, why isn't that sufficient? Because, Your Honor, first, on the matter of the replacement-slash-redundancy issue, this court upheld summary judgment in Weston-Smith on a similar situation, very related. And in that case, there was a senior-level director position. It was held by a woman who was out on maternity leave. When she was gone, the management decided they no longer needed that position. And instead of bringing her back after maternity leave, they eliminated that position and created a new position, which they gave to a subordinate, much as in this case the claim is that her subordinate got her job. And in that case, the court upheld summary judgment, finding that the two positions were different enough that there was no... Yes, but different enough. Okay. Here the claim is it's essentially the same position. The same claim was made. Okay. Does the jury get to make that evaluation, or does the court? Okay. What is so obvious about the new position being created that is different than the job description she held? Just tick them off. Absolutely. So regarding Mr. Jolin's new role as the SPPC administrator, it has a different title. It has a different pay grade. It has fewer responsibilities. It does not have a specific supervisory role of the entire organization. Rather, his role as supervisor...  Title and pay rates kind of doesn't help you, it argues the other way. The specific jobs, no supervisory responsibility at all? Supervisory responsibility limited to projects as the need arises. Whereas the associate director position was specifically responsible for all 260 employees at the organization. I thought the big difference was that the new position required a J.D. and was really just policy-focused. The new job didn't require a J.D. The administration did find it was useful in the role. It was preferred J.D.? I don't think it was even necessarily listed in the job specs per se, but it was something that came up in the description of why they chose him for that role. But I think one of the things that's just troubling me is that the normal process for filling a role wasn't followed here. It seemed from when I reviewed the record that it was pretty clear that there are strict processes in place. You had to make the role available for people to apply, multiple people to apply to it. And here, she's let go. Then the role is announced. And he's just promoted straight into it with no application process at all. And that seems that change in the process in a way that leaves her out of an opportunity as the just assume for a moment that we don't agree with you that she wasn't that we think she is the only woman on the executive team and she's the only one let go. Why isn't that enough in your view that the failure to follow the process and then the fact that she's the only one left out of a position and she's the only woman, why wouldn't that be enough to go to a jury? So assuming in this case, which we don't believe is true, that they did not follow the process because the SBA process was used many times over the years for this exact purpose. But assuming that the jury does find that they stepped out of line. This court held in Dunn quite recently that such a step out of line. So, for example, in the Dunn case, there was a consolidation of two positions. They didn't post the job on the website as they were supposed to do. And this court held that was merely a criticism of the process of a sort of business judgment that was made by the organization to enact the change. And that was not enough to get before a jury. So following this court's precedent, such a small change in the process, and assuming there was a change, which there was not, assuming there was such a change, that would still not amount to evidence of discriminatory intent, particularly here. So I would also point this court, for example, to the Lehens case, the AT&T. In that case, this court also affirmed summary judgment where, in a similar sort of circumstance, the court found there was no evidence on the record that was in conflict with the reasons provided by the employer, and there was no specific mention of the prohibited characteristic in that decision-making process. The same is true in this case. From your point of view, what is the single best case that supports your summary judgment should be affirmed here? I could pick two, but the first one would be Weston-Smith because the facts line up very neatly. I would also point towards Dunn because it's a more recent case. Okay. Thank you. Of course, Your Honor. And finally, Your Honors, there are lots of reasons why this case could go down on pretext. We would also like to just clarify that there is no prima facie standard, or rather the district court should not have assumed replacement in making the prima facie determination. I don't think that should be your final word. Would you like to use your final sentence differently? Well, I have more time, Your Honor, but I can close out with my conclusion, which is that simply there is no evidence of discrimination on this record relating to her sexuality or gender. And for that reason, there can be no judgment that should be affirmed. Before you go, what about your Eleventh Amendment argument? Oh, Your Honor, both of us agreed that that is currently pending before the court in a separate case, and we suggest that you abide by that decision. However, it is clear from the statutory language of the Rhode Island statutes that neither one explicitly allows for federal determination of those issues. I'm just curious. Does that issue really matter in this case? Not really, Your Honor. If we reverse on the Title VII claim, is there any remedy under state law that she couldn't get under Title VII? I don't believe so, Your Honor, and they use the same standard. Yeah, I didn't see any real difference. So that concludes that. Okay, thank you. Thank you, counsel. Will attorney for Appellant Ripley please reintroduce yourself on the record? You have a three-minute rebuttal. Thank you. I am Chip Muller for Kimberly Ripley. Judge Celia asked, I believe asked earlier about evidence that the decision was related to gender, the decisions that Mr. Yarn made were related to gender, and I answered that question, but I'd like to add a few more facts to my answer, and that is the fact that Mr. Yarn and Mr. Pena created two jobs out of full cloth for Mr. Jolin and also Mr. Rasko. We haven't talked a lot about Jonathan Rasko, but Mr. Rasko wanted to resign, and Ms. DePena created an opportunity for him and moved him into that position. And no one in DHS created a position for a woman. Lastly, as you know, Mr. Jolin and Mr. Yarn called each other brother. We don't hang our hat on that evidence, but we do think it's important to consider. I'd like to just address the J.D. required, Juris Doctor required issue. Mr. Jolin, when he drafted his own job description, he put in that originally, and importantly, that was taken out of the final draft of his job description. And regarding the strict processes that the state requires for hiring and firing, not only did the state not eliminate the position because it would have required a public hearing to eliminate the associate director position, but when Mr. Jolin was ultimately given the SPPC administrator position, it was done by private contract. And that contract device is not in the personnel manual. And I think that the court and the jury could find that to be a deviation from state practice. The decision of Weston Smith is distinguishable from this case in many ways. For one, it was a restructuring of 20 employees. This was a restructuring of one person, Ms. Ripley. And there was also a question of job performance. And there was evidence that the decision maker had ample opportunity to observe the job performance of the two leading candidates for the position. And this court found that the decision maker had articulated reasons why the person selected was more qualified. Qualifications are not an issue in this case. And finally, absent in Weston Smith and absent in the Dunn case, including the reorganization of one aspect of the case, is the fact that the corporations in Dunn and Weston Smith did a objective look at the entire organization, whereas here, Mr. Yarn did a fake, as the jury could conclude, a fake lien analysis that failed to include the decision, his decision to put Mr. Joel in, to create a new position for Mr. Joel and to put him into it. Thank you. Thank you. Thank you, counsel. That concludes arguments in this case.